**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **TIMOTHY LEE BIPPUS,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13cv00006 |
| | ) | |
| **CAROLYN W. COLVIN,**[1] | ) | **REPORT AND RECOMMENDATION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Timothy Lee Bippus, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bippus protectively filed an application for DIB on June 2, 2009, alleging disability as of April 18, 2006, due to back problems. (Record, ("R."), at 13, 146-47, 174, 195.)[2] The claim was denied initially and on reconsideration. (R. at 81-83, 87, 89-91.) Bippus then requested a hearing before an administrative law judge, ("ALJ"), (R. at 13.) The hearing was held on May 24, 2011, at which Bippus was represented by counsel. (R. at 31-56.)

By decision dated May 27, 2011, the ALJ denied Bippus's claim. (R. at 13-25.) The ALJ found that Bippus met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2013. (R. at 15.) The ALJ also found that Bippus had not engaged in substantial gainful activity since April 18,

---

[2] Bippus previously filed a DIB application, which was denied by hearing decision dated June 1, 2009. (R. at 13.) This decision became final when the Appeals Council denied Bippus's request for review of that decision on December 3, 2009. (R. at 13.)

2006, the alleged onset date.[3] (R. at 15.) The ALJ found that the medical evidence established that Bippus suffered from severe impairments, namely degenerative disc disease of the lumbar spine, status-post L5-S1 hemilaminectomy, and right disc herniation of the lumbar spine, but she found that Bippus did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-17.) The ALJ also found that Bippus had the residual functional capacity to perform a range of light work[4] that did not require more than occasional climbing of ramps and stairs, occasional balancing, stooping or crouching, no kneeling, crawling or repetitive bending, no more than frequent handling with the left dominant hand and that did not require more than concentrated exposure to hazardous machinery, unprotected heights, working on vibrating surfaces or climbing ladders, ropes or scaffolds. (R. at 17.) The ALJ also found that Bippus was limited in his ability to push and/or pull with the lower extremities to a maximum of 20 pounds occasionally and 10 pounds frequently. (R. at 17.) The ALJ found that Bippus was unable to perform his past relevant work. (R. at 23.) Based on Bippus's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that he could perform, including jobs as a marker, an office helper and an information clerk. (R. at 23-24.) Thus, the ALJ found that Bippus was not under a disability as defined under the Act and was not eligible for benefits. (R. at 24-25.) *See* 20

---

[3] The ALJ noted, however, that Bippus made an unsuccessful work attempt after the alleged disability onset date. (R. at 15.)

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If a person can perform light work, he also can perform sedentary work. *See* C.F.R. § 404.1567(b) (2013).

C.F.R. § 404.1520(g) (2013).

After the ALJ issued his decision, Bippus pursued his administrative appeals, (R. at 7), but the Appeals Council denied his request for review. (R. at 1-4.) Bippus then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2013). The case is before this court on Bippus's motion for summary judgment filed September 18, 2013, and the Commissioner's motion for summary judgment filed October 21, 2013.

## II. Facts[5]

Bippus was born in 1964, (R. at 195), which, at the time of the ALJ's decision, classified him as a "younger person" under 20 C.F.R. § 404.1563(c). Bippus has an eleventh-grade education and past relevant work experience as a security guard, a shuttle car operator, a scoop operator and a roof bolter in the coal mines. (R. at 175, 180.)

Vocational expert, James Williams, also was present and testified at Bippus's hearing. (R. at 48-55.) Williams classified Bippus's work as a "miner

---

[5] The relevant time period for the court's consideration is June 2, 2009, the day following the date of the prior decision, through May 27, 2011, the date of the current ALJ's decision. To the extent that any medical evidence outside of this time period is included in the record, it is for background or clarification purposes only. Also, only medical evidence relevant to Bippus's physical impairments is included in this Report and Recommendation, as he appeals the ALJ's decision on this ground only.

one" as very heavy[6] and skilled, as a roof bolter and as a shuttle car operator as medium[7] and semi-skilled, as a scoop operator as medium and skilled, and as a security guard, as normally performed, as light and semi-skilled. (R. at 51.) Williams was asked to consider a hypothetical individual of Bippus's age, education and work history, who could lift and carry items weighing up to 20 pounds occasionally, 10 pounds frequently, stand and walk up to six hours in an eight-hour workday, sit for up to six hours in an eight-hour workday, who was limited in the ability to push and pull with the lower extremities, who could never kneel and crawl, but who could occasionally climb ramps and stairs, balance, stoop and crouch, who could frequently handle items with the left hand, who could perform work that required no more than concentrated exposure to hazardous machinery, climbing ladders, ropes or scaffolds or working on vibrating surfaces and who could not perform repetitive bending. (R. at 51-52.) William testified that such an individual could not perform any of Bippus's past relevant work as he actually performed it or as it is customarily performed in the national economy. (R. at 52.) However, Williams testified that such an individual could perform the jobs of a marker, an office helper and an information clerk, all of which existed in significant numbers in the national economy. (R. at 53.) Next, Williams was asked to consider a hypothetical individual who was limited as set forth in a Medical Source Statement completed by Dr. Jim C. Brasfield, M.D. (R. at 53,

---

[6] Very heavy work involves lifting items weighing more than 100 pounds at a time with frequent lifting or carrying of items weighing 50 pounds or more. If someone can perform very heavy work, he also can perform heavy, medium, light and sedentary work. *See* C.F.R. § 404.1567(e) (2013).

[7] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* C.F.R. § 404.1567(c) (2013).

406-08.)  Williams testified that such an individual could not perform Bippus's past work either as performed or as it is customarily performed in the national economy.  (R. at 54.)  Williams further testified that such an individual could not perform other jobs in the national economy.  (R. at 55.)

In rendering his decision, the ALJ reviewed medical records from Mountain View Regional Medical Center; Highlands Neurosurgery, P.C.; Park Avenue Physical Therapy; Bristol Neurological Associates; Wellmont Bristol Regional Hospital; Renaissance Surgery Center; Solutions Counseling, LLC; Anne B. Jacobe, LCSW; Appalachian Regional Health Care Whitesburg Hospital; Dr. Jim C. Brasfield, M.D.; Ralph Ramsden, Ph.D.; and Dr. J. Travis Burt, M.D.  Bippus's attorney also submitted medical evidence from Dr. Brasfield to the Appeals Council.[8]

The medical evidence shows that Bippus presented to the Emergency Department at Mountain View Regional Medical Center on April 18, 2006, with complaints of low back pain with some radiation to the left leg after injuring himself at work while lifting and turning a moving mine cable while in a bent position.  (R. at 269-75.)  Physical examination showed only moderate tenderness to palpation over the lower lumbar spine.  (R. at 270.)  X-rays showed no fracture.  (R. at 270.)  Dr. Rimon Ibrahim, M.D., diagnosed Bippus with acute low back pain and acute lumbar myofascial strain.  (R. at 270.)  On April 20, 2006, Bippus saw

---

[8] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-4), this court also must take this evidence into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

Dr. Jim C. Brasfield, M.D., a neurosurgeon, for a workers' compensation examination. (R. at 321-23.) Bippus reported low back pain with some discomfort radiating down to the left leg. (R. at 321.) He further reported that muscle relaxants and anti-inflammatories prescribed by Dr. Ibrahim did not provide adequate relief. (R. at 322.) Dr. Brasfield advised Bippus to remain off of work at least until his return appointment on April 25, and he ordered a lumbar MRI. (R. at 322-23.) On April 25, 2006, Bippus complained of continued discomfort, worsened standing, and he further reported that he was beginning to have right leg pain, as well. (R. at 318-20.) Dr. Brasfield noted the lumbar MRI findings showing that Bippus had a disc protrusion in the right central and subarticular region at L5-S1, which touched the right S1 nerve root and may minimally displace it. (R. at 318, 328-29.) Dr. Brasfield continued to diagnose a symptomatic work-related injury causally related to a right L5 disc herniation. (R. at 318.) Over the next two months, Dr. Brasfield attempted to treat Bippus's herniated disc conservatively with medications and an epidural steroid injection. (R. at 319, 336-37.) However, on May 30, 2006, he recommended surgical removal of the right L5 disc herniation. (R. at 314.) After obtaining a second opinion from Dr. Travis J. Burt, M.D., another neurosurgeon, who agreed with Dr. Brasfield that surgical intervention was reasonable, Bippus elected to proceed with surgery. (R. at 281, 310-11.) On June 19, 2006, Dr. Brasfield performed a right L5-S1 hemilaminectomy with decompression of the right S1 nerve root without obvious complications. (R. at 334-35.)

By August 1, 2006, Bippus reported that his right leg pain was "much improved." (R. at 303-05.) Dr. Brasfield diagnosed him with post-lumbar

laminectomy syndrome, causally related to his work injury, and he began Bippus in a progressive work-hardening program for the lumbar spine. (R. at 303.) Bippus began physical therapy on August 2, 2006, at Park Avenue Physical Therapy. (R. at 288-91.) He attended 12 physical therapy sessions between August 2 and August 18, 2006. (R. at 284-91.) However, on August 18, 2006, Mary Knettle, a licensed physical therapist, reported that Bippus felt that he had reinjured his back. (R. at 284.)

Bippus saw Dr. Brasfield on August 14, 2006, complaining of increased back and leg pain, which Bippus attributed to a possible reinjury in physical therapy. (R. at 302.) Straight leg raise testing showed some discomfort in the right buttock and posterior thigh, but there was no evidence of foot drop. (R. at 302.) Dr. Brasfield was concerned about the recurrence of leg pain, which had previously resolved. (R. at 302.) Despite this concern, he continued Bippus in range of motion physical therapy until his return visit in one week. (R. at 302.) He again diagnosed Bippus with post-lumbar laminectomy syndrome, causally related to work injury. (R. at 302.) When Bippus returned to Dr. Brasfield on August 21, 2006, he reported the decreased strenuousness of physical therapy had resulted in some relief to his back and leg discomfort. (R. at 298.) However, Bippus continued to note that it was still bothersome and seemed to be worse over the previous couple of weeks. (R. at 298.) Dr. Brasfield scheduled a lumbar MRI, and he advised Bippus to continue with range of motion lumbar therapy. (R. at 298.) A lumbar MRI, dated August 25, 2006, showed a small residual or recurrent disc herniation at the right L5 disc level with some abutment of the right S1 nerve root. (R. at 326-27.) On August 28, 2006, Bippus noted continued back and leg pain,

but he reported the leg pain was not as severe as preoperatively. (R. at 296-97.) Dr. Brasfield continued Bippus in physical therapy and advised him to remain off of work until September 18, 2006. (R. at 296.) On September 18, 2006, Bippus's right leg pain was deemed prohibitive. (R. at 448.) There was no evidence of foot drop, and Dr. Brasfield recommended a lumbar epidural steroid injection. (R. at 448.) He further advised Bippus to discontinue physical therapy. (R. at 448.) Dr. Brasfield diagnosed recurrent right L5 disc herniation, causally related to work injury, and he advised Bippus to remain off of work. (R. at 448-49.) Dr. Brasfield opined that it was very unlikely that Bippus would be able to return to work as an underground coal miner, which required working 60 to 70 hours per week performing heavy labor. (R. at 449.) Bippus underwent a lumbar epidural steroid injection on September 29, 2006, which he reported helped. (R. at 332.)

On October 24, 2006, Dr. Brasfield continued to diagnose Bippus with symptomatic recurrent right L5 disc herniation, causally related to work injury, and he advised him to remain off of work. (R. at 446-47.) Dr. Brasfield also stated that Bippus would have permanent lifting restrictions of approximately 20 or 30 pounds. (R. at 447.) On November 12, 2006, Dr. Brasfield clarified that Bippus's recurrent right L5 disc herniation was causally related to his April 18, 2006, work injury because it had occurred during his efforts at postoperative improvement from the prior right L5 disc herniation, which had required surgical repair and which had directly resulted from that work injury. (R. at 295.) Dr. Brasfield further stated that Bippus's job as an underground coal miner involved frequent or persistent bending or lifting, and he did not believe Bippus would be capable of prolonged repetitive bending, squatting or lifting due to the lumbar disc herniation.

(R. at 295.)  On January 22, 2007, Bippus had increased right leg pain and occasional left leg pain. (R. at 444.)  Despite Bippus's report of episodes of inability to perform regular activities for a couple of days at a time, as well as positive straight leg raise testing on the right, he informed Dr. Brasfield he wished to treat the recurrent disc herniation conservatively at that time.  (R. at 444.)

On February 20, 2007, Bippus reported increased pain the previous week with right lower extremity and continued low back pain.  (R. at 347-48.)  Straight leg raise testing was positive in the right lower extremity, but there was no evidence of foot drop.  (R. at 347.)  He was able to toe raise without difficulty, and neurological was intact.  (R. at 347.)  Bippus requested to proceed with surgical intervention.  (R. at 347.)  On March 5, 2007, Bippus underwent a second right L5 laminectomy, which he tolerated well.  (R. at 330-31, 443.)  When Bippus saw Dr. Brasfield on March 21, 2007, he reported a positive response to the surgery, and Bippus had increased his daily activity with decreasing analgesic requirement as instructed.  (R. at 343-44.)  There were no new postoperative neurological deficits. (R. at 343.)  Dr. Brasfield stated that Bippus was making the expected recovery. (R. at 343.)  Continued progressive activity was discussed with Bippus, and he was advised to remain off of work.  (R. at 343.)  In April and May 2007, Bippus was doing well postoperatively.  (R. at 339, 341.)  He continued to have some lumbar spine discomfort, but was clearly improved.  (R. at 341.)  Bippus's severe leg pain was resolved, and straight leg raise testing was negative bilaterally. (R. at 339, 341.)  Dr. Brasfield advised Bippus to remain off of work, and he encouraged him to continue with a walking exercise program. (R. at 339, 341.)

On July 10, 2007, Dr. Brasfield reported that Bippus had some residual weakness with toe raising on the right lower extremity, but there was no evidence of foot drop. (R. at 441.) His low back and right leg pain had improved. (R. at 441.) Dr. Brasfield placed Bippus at maximum medical improvement, ("MMI"), with a permanent partial impairment, ("PPI"), rating of 8% to the right leg with permanent work restrictions of lifting no more than 20 pounds and avoidance of repetitive bending. (R. at 439, 441.) Dr. Brasfield continued to diagnose post-laminectomy syndrome of the lumbar spine. (R. at 441.) He kept Bippus out of work until a suitable job description could be reviewed by him. (R. at 441.) Bippus returned to Dr. Brasfield on October 19, 2007, at which time he continued to exhibit toe raise weakness on examination. (R. at 438-40.) Bippus brought a job description with him for Dr. Brasfield's review, but Dr. Brasfield thought it exceeded Bippus's restrictions and would place him at increased risk for a possible injury requiring further surgical intervention. (R. at 439.) Bippus's diagnosis remained unchanged. (R. at 439.)

On April 22, 2008, Bippus saw Trish Cook, P.A.-C, a certified physician's assistant for Dr. Brasfield. (R. at 436-37.) At that time, Bippus had returned to work with a 30-pound work restriction, and he noted he was doing well. (R. at 436.) He reported some increased lumbar discomfort without radiculopathy. (R. at 436.) Bippus stated that he was standing for long periods of time, which caused his back to be a little more painful. (R. at 436.) He further noted some increased muscle spasms, which Zanaflex seemed to control. (R. at 436.) Cook diagnosed post right L5 laminectomy in March 2007 from a work-related injury, and she continued Bippus on the 30-pound lifting restriction. (R. at 436.) Bippus returned

to Cook on May 29, 2008, noting increased back pain, but he remained neurologically intact with no evidence of foot drop. (R. at 434.) Cook noted she would try Zanaflex and Lortab in an effort to try to calm his symptoms down. (R. at 434.) She further stated that a lumbar MRI was necessary. (R. at 434.) She informed Bippus she did not have the authority to take him out of work. (R. at 434.) An MRI of the lumbar spine, dated June 3, 2008, showed a posterior disc bulge with right paracentral disc protrusion/extrusion with mass effect on the right S1 nerve root, but without significant spinal canal stenosis or neural foraminal narrowing. (R. at 362-64.) The MRI also showed degenerative disc disease at the L3-L4 and L4-L5 levels without significant spinal canal stenosis or neural foraminal narrowing. (R. at 364.) There was no nerve root clumping or enhancement. (R. at 364.) On June 10, 2008, Dr. Brasfield noted that Bippus had been working as a security guard since the latter part of March 2008. (R. at 381.) However, Bippus had recently noted increasing pain in his back and right posterior thigh. (R. at 381.) Bippus had no evidence of foot drop, and he did not appear to be in distress. (R. at 381.) Dr. Brasfield reviewed the June 3 MRI, and agreed that there was a prominence to the right L5 disc level, but could not say that he saw a definite extruded fragment. (R. at 381.) Dr. Brasfield wanted Bippus to try another epidural steroid injection before considering any type of surgery, to which Bippus agreed. (R. at 381.) Dr. Brasfield allowed Bippus to continue in his job as a security guard. (R. at 381.)

On October 14, 2008, Bippus reported not having undergone the recommended epidural steroid injection. (R. at 379.) Instead, he reported that he was "okay" with his current pain regimen of Zanaflex, Lortab and Celebrex. (R. at

379.)  He further reported that he had continued with his work activities.  (R. at 379.)  He stated that he did not want to proceed with an epidural block until his condition was "worse."  (R. at 379.)  Bippus remained neurologically intact.  (R. at 379.)  Cook discussed the importance of walking activities and use of Zanaflex only when having muscle spasms.  (R. at 379.)  On January 6, 2009, Bippus saw Mark S. Mehlferber, P.A.-C, another certified physician's assistant of Dr. Brasfield's, for a follow up.  (R. at 377-78.)  He reported his pain was worse with standing, sitting or walking, but did fairly well with Zanaflex, Celebrex and Lortab.  (R. at 377.)  Bippus reported trying to be as active as possible.  (R. at 377.)  He remained neurologically intact.  (R. at 377.)  His diagnosis remained post-laminectomy syndrome.  (R. at 377.)  On March 11, 2009, Bippus reported continuing to have good days and bad days.  (R. at 375.)  Objective examination was unchanged, as was his diagnosis.  (R. at 375.)  On June 10, 2009, Bippus stated that he had applied for several jobs and had not been given the opportunity to return to work secondary to his work restrictions.  (R. at 373.)  He stated that he planned to reapply for disability benefits secondary to the fact that he was unable to seek employment with his permanent work restrictions.  (R. at 373.)  Bippus's diagnosis remained post-laminectomy syndrome of the lumbar spine with right L5 lami/disckectomy times two, causally related to a work injury.  (R. at 373.)

Dr. Robert McGuffin, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Bippus on September 2, 2009.  (R. at 62-65.)  Dr. McGuffin found that Bippus could occasionally lift and/or carry items weighing up to 20 pounds and frequently lift and/or carry items weighing up to 10 pounds.  (R. at 62.)  He found that Bippus could stand and/or walk about six hours

in an eight-hour workday and sit about six hours in an eight-hour workday. (R. at 62.) Dr. McGuffin opined that Bippus's ability to push and/or pull was unlimited, other than as stated for the lift/carry limitations. (R. at 62.) Dr. McGuffin further opined that Bippus could frequently balance, occasionally climb ramps and stairs, stoop and crouch, but never climb ladders, ropes or scaffolds, kneel or crawl. (R. at 62-63.) Dr. McGuffin imposed no manipulative, visual, communicative or environmental limitations. (R. at 63.) Dr. McGuffin concluded that Bippus did not have the residual functional capacity to perform any past relevant work as actually performed or as it is generally performed in the national economy. (R. at 64.) However, because Dr. McGuffin found that Bippus had the residual functional capacity to perform light work, he concluded that Bippus was not disabled. (R. at 64.)

Bippus saw Cook on September 9, 2009, noting increased back pain with bilateral leg pain. (R. at 387.) Bippus reported that he could no longer tolerate the increased lumbar and bilateral leg pain, specifically stating that his leg pain was now bad enough to consider surgical intervention. (R. at 387.) On September 17, 2009, Bippus underwent an electromyography study on the right leg and a nerve conduction velocity study involving two motor nerves, two sensory nerves and two H reflex tests.[9] (R. at 389.) An MRI of the lumbar spine, dated September 24, 2009, showed a moderate to large recurrent disc herniation. (R. at 385.) On September 29, 2009, Bippus reported back pain and leg pain. (R. at 391.) However, despite his previous report to the contrary, he stated that his pain was not substantial enough to consider surgery. (R. at 391.) Bippus agreed to let Dr.

_____
[9] The results of these tests are not included in the administrative record.

Brasfield know if his discomfort got beyond his tolerance. (R. at 391.)  If so, a lumbar myelogram would be performed for further assessment. (R. at 391.) On October 13, 2009, Bippus yet again reported that his leg pain was not substantial enough to consider surgical intervention. (R. at 393.) Dr. Brasfield continued to diagnose post-lumbar laminectomy syndrome.  (R. at 393.)

On November 10, 2009, Dr. Brasfield completed an Assessment Of Ability To Do Work-Related Activities (Physical), finding that Bippus could occasionally lift and/or carry items weighing up to 20 to 30 pounds and that he could stand and/or walk for a total of four hours in an eight-hour workday, but for only 30 minutes without interruption.  (R. at 406-08.)  Dr. Brasfield further found that Bippus could sit for a total of three hours in an eight-hour workday, but for only 30 to 45 minutes without interruption. (R. at 407.) He found that Bippus could frequently balance, occasionally climb, stoop and crouch, but never kneel or crawl. (R. at 407.) Dr. Brasfield opined that Bippus's abilities to push and/or pull were affected by his impairment, in that his lumbar disc disease was aggravated by such activities. (R. at 407.)  He imposed no environmental restrictions on Bippus. (R. at 408.)  Dr. Brasfield opined that Bippus would be absent from work more than two days per month due to his impairment(s) or related treatment.  (R. at 408.)

On March 8, 2010, Dr. Michael Hartman, M.D., another state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Bippus could perform light work.  (R. at 72-76.)  In particular, he found that Bippus could occasionally lift and/or carry items weighing up to 20 pounds and frequently lift and/or carry items weighing up to 10 pounds.  (R. at 72.)   Dr.

Hartman found that Bippus could stand and/or walk for about six hours in an eight-hour workday and sit about six hours in an eight-hour workday. (R. at 73.) He found that Bippus's ability to push and/or pull was unlimited, other than as stated for the lift and/or carry restrictions. (R. at 73.) Dr. Hartman found that Bippus could occasionally climb ramps and stairs, balance, stoop and crouch, but never climb ladders, ropes or scaffolds, kneel or crawl. (R. at 73.) He imposed no manipulative, visual, communicative or environmental limitations. (R. at 73.) Dr. Hartman opined that Bippus did not have the residual functional capacity to perform any past relevant work as actually performed or as it is generally performed in the national economy. (R. at 74.) However, Dr. Hartman found that, given his age, education and past work experience, Bippus was able to perform other jobs which were less demanding, and he opined that Bippus was not disabled. (R. at 75.) He specifically noted that, although Bippus had pain in his back, he was able to stand, walk and move about without severe limitations, and he stated that Bippus should be able to perform work which did not involve heavy lifting. (R. at 75.)

On February 3, 2010, Bippus again saw Cook with continued complaints of leg pain. (R. at 433.) However, he again stated he did not consider it substantial enough to warrant surgical intervention. (R. at 433.) His diagnosis remained unchanged, and Bippus was continued on medications. (R. at 433.) From May 12, 2010, through December 29, 2010, Bippus's diagnosis remained post-laminectomy syndrome, and he was continued on medications. (R. at 431-32, 455, 457.) On August 11, 2010, Cook instructed Bippus to continue the permanent work activity assigned by Dr. Brasfield at the time of reaching MMI beginning the following

day.  (R. at 457.)

On March 23, 2011, Cook noted that since his last office visit, Bippus's complaints had been stable without improvement or worsening.  (R. at 451-52.) She further noted that there were no new neurological changes.  (R. at 452.)  Cook diagnosed work-related injury with causally related lumbar disc herniation requiring posterior lumbar interbody fusion and pedicle screw instrumentation.  (R. at 452.)  Bippus was again instructed to continue work activity assigned at the time of MMI designation.  (R. at 452.)  Cook noted that treatment would continue to be conservative pain management with no planned surgical intervention at that time. (R. at 452.)

Dr. Brasfield completed another Assessment Of Ability To Do Work-Related Activities (Physical) on May 18, 2011.  (R. at 463-65.)  He found that Bippus could lift and/or carry items weighing up to 20 to 30 pounds occasionally, stand and/or walk for a total of four hours in an eight-hour workday, but for only 30 minutes without interruption, and sit for a total of three hours in an eight-hour workday, but for only 30 to 45 minutes without interruption.  (R. at 463-64.)  Dr. Brasfield also found that Bippus could frequently balance, occasionally climb, stoop and crouch, but never kneel or crawl.  (R. at 464.)  He also found that Bippus's ability to push and/or pull was affected by his impairment.  (R. at 464.) Dr. Brasfield imposed no environmental restrictions on Bippus.  (R. at 465.) Lastly, Dr. Brasfield opined that Bippus would be absent from work more than two days monthly due to his impairment(s) or related treatment.  (R. at 465.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2013).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Bippus argues that the ALJ erred by failing to adhere to the treating physician rule and give controlling weight to Dr. Brasfield's opinions. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's

Brief"), at 5-6.) The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(c) (2013). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992 (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

In reaching her residual functional capacity finding, and ultimate finding of nondisability, the ALJ stated that she was according Dr. Brasfield's opinion evidence little weight because the sitting, standing and walking limitations were not consistent with the objective findings in the record, nor was the finding that Bippus would miss more than two work days monthly. (R. at 21-22.) The ALJ also noted that Dr. Brasfield's treatment notes often failed to document any objective findings, instead, simply noting a 20- to 30-pound lifting restriction, and when objective findings were reported, they were largely unremarkable. (R. at 22.) The ALJ further stated that Dr. Brasfield's opinions were not supported by Bippus's own statements that his pain was not substantial enough to require a third surgery, as well as his statements regarding his activities of daily living. (R. at 22.) On the other hand, the ALJ accorded considerable weight to the opinions of the state agency physicians, Drs. McGuffin and Hartman, because their opinions, which were nearly identical, were more consistent with the objective findings contained in the record. (R. at 22.)

Based on my review of the record, I find that substantial evidence does not exist to support the ALJ's weighing of the evidence. In particular, I find that substantial evidence does not exist to support the ALJ's decision not to grant controlling weight to Dr. Brasfield's opinions. In November 2009 and May 2011, Dr. Brasfield opined that Bippus could occasionally lift and/or carry items weighing up to 20 to 30 pounds and that he could stand and/or walk for a total of four hours in an eight-hour workday, but for only 30 minutes at a time. (R. at 406-08, 463-65.) He opined that Bippus could sit for a total of three hours in an eight-hour workday, but for only 30 to 45 minutes at a time. (R. at 407, 464.) Dr. Brasfield opined that Bippus could frequently balance, occasionally climb, stoop and crouch, but never kneel or crawl. (R. at 407, 464.) He opined that Bippus would be absent from work more than two days monthly. (R. at 408, 465.)

The residual functional capacity finding of Dr. Brasfield are, for the most part, confirmed by those of the agency physicians, Dr. McGuffin and Dr. Hartman. The only variance is Dr. Brasfield's opinion that Bippus could stand/walk for only four hours in an eight-hour workday, sit for only three hours in an eight-hour workday and that Bippus would miss more than two days of work a month. The ALJ rejected these findings, claiming they were unsupported by "objective findings." (R. at 21-22.) The undisputed objective evidence, however, shows that Bippus again suffers from a moderate to large recurrent disc herniation at the L5-S1 level. Thus, I find the ALJ erred when she found that Dr. Brasfield's opinion was "unsupported by any objective findings."

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now

submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the Commissioner's weighing of the medical evidence;

2. Substantial evidence does not exist in the record to support the Commissioner's physical residual functional capacity finding; and

3. Substantial evidence does not exist in the record to support the Commissioner's finding that Bippus was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Bippus's and the Commissioner's motions for summary judgment and remand Bippus's claim to the Commissioner for further consideration.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2013):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the

-21-

magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    May 13, 2014.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE